156

[945 NYS2d 673]

RUTH L. BURTMAN, Respondent, v ROBIN R. BROWN, M.D., et al., Defendants, ELIZABETH J. BEAUTYMAN, M.D., Appellant.

First Department, June 5, 2012

## APPEARANCES OF COUNSEL

*Bartlett, McDonough, Bastone & Monaghan, LLP*, White Plains (*Edward J. Guardaro, Jr.* and *Patricia D'Alvia* of counsel), for appellant.

*Marie R. Hodukavich*, Peekskill, for respondent.

## OPINION OF THE COURT

CATTERSON, J.

In this medical malpractice action, we are asked to determine whether the plaintiff's primary care physician had any duty to supervise or override a course of treatment initiated by another physician actively treating the plaintiff. In this case, we find that the motion court erred in finding that the defendant, Elizabeth Beautyman, M.D., as primary care physician, had an independent duty to assess the plaintiff's condition and order

diagnostic testing such as a biopsy. On the contrary, as set forth more fully below, case law supports the defendant's position that her status as the plaintiff's primary care physician is not dispositive as to whether a duty exists in this case. Moreover, where no duty is found to exist, the opinion of plaintiff's expert that the defendant deviated from the standard of accepted medical practice is irrelevant.

The following facts are undisputed: On August 4, 2005, the plaintiff, Dr. Ruth Burtman, a 43-year-old licensed psychologist, saw the defendant Dr. Beautyman, an internist and primary care physician for the first time. At the time of the plaintiff's first visit, she was three months pregnant and already under the care of defendant West Care Associates (hereinafter referred to as West Care), a rotating group obstetrical practice, which included the defendant doctors Robin Brown and Hope Langer. The plaintiff had been a patient at West Care since 1997. In 1999, she was treated by Dr. Brown and West Care for an underarm mass. At the time, Dr. Brown had ordered a tissue sample and subsequently the mass was found to be a benign lipoma.

Prior to the plaintiff's first visit with the defendant, she had two prenatal visits at West Care. Dr. Brown examined her on both visits, on June 30, 2005 and July 28, 2005.

On August 4, 2005, at the plaintiff's first visit with the defendant, she requested a full checkup, and the defendant performed a physical examination. The plaintiff subsequently had another prenatal checkup with Dr. Brown at West Care on August 25, 2005.

On September 20, 2005, six weeks after her first visit with the defendant, and almost a month after her prior prenatal visit with Dr. Brown, Dr. Langer examined the plaintiff and noted the presence of a mass in the upper left quadrant of her abdomen. Dr. Brown requested a sonogram which was performed on October 12, 2005.

On October 13, 2005, a radiology report was faxed to the defendant who noted that the report referred to a mass consistent with a benign fibrolipoma. She did not discuss the report with the plaintiff, or any of the plaintiff's other doctors.

It is further undisputed that the West Care doctors as part of their care of the plaintiff decided to adopt a "wait and watch" approach. They did not attempt to remove the mass while the plaintiff was pregnant because there was "no concern" as to the mass.

The plaintiff had a second office visit with the defendant in January 2006 after she fell and sprained her ankle. She asked the defendant for a referral to a physical therapist. Subsequently, the plaintiff gave birth to a baby boy on February 12, 2006. She testified that by the time she gave birth, the mass had increased in size.

In June 2006, she returned to a different primary care physician whom she had previously seen in February 2005. This visit concerned a tick bite on her abdomen. It was not until the end of October 2006 that the plaintiff saw Dr. Robert Grant, a plastic surgeon, who made a diagnosis of subcutaneous masses. On December 8, 2006, Dr. Grant performed the excision of the two masses. The pathology report of December 19, 2006, showed that the 10cm left quadrant mass was an "atypical lipoma," suggesting a malignancy. On January 6 2007, a surgical oncologist at Memorial Sloan Kettering, performed a "wide radical excision of th[e] area."

The plaintiff commenced the instant medical malpractice action on or about January 13, 2008, against, inter alia, defendant Dr. Beautyman, the obstetricans at West Care, and West Side Radiology. With respect to Dr. Beautyman (hereinafter referred to as the defendant), the plaintiff alleged departures from good and accepted standards of practice. The plaintiff claims the defendant failed to properly examine, test, diagnose and treat her for a left upper-quadrant abdominal soft tissue mass; specifically, that the defendant failed to order a biopsy which would have revealed that her condition was a malignant liposarcoma. The plaintiff claims that as a result she was deprived of the option of less radical and invasive surgery.

Upon completion of discovery, virtually all the defendants moved for summary judgment. The court granted the summary judgment motion of the individual doctors in the obstetrical practice because the plaintiff failed to oppose their summary judgment motion. The court denied Dr. Beautyman's summary judgment motion.

In a decision entered November 22, 2010, the court found that questions of fact existed as to whether the defendant had carried out a thorough abdominal examination on August 4, 2005 (2010 NY Slip Op 33325[U] [2010]). The court based its finding on the plaintiff's expert's statement that "at or about this time . . . the plaintiff herself could feel these masses" (id. at *6). The court also found an issue of fact as to whether the defendant should have conducted an abdominal examination at

plaintiff's second office visit in January 2006—three months after the sonogram report was faxed to her. The court held that "at the very least, [defendant] had an obligation to discuss that report with [plaintiff] . . . and to discuss with her a differential diagnosis with a suggestion for a follow-up biopsy" (*id.* at *7). The court based its holding primarily on the defendant's status as the primary care physician. It relied on the opinion of the plaintiff's expert which stated that an abdominal mass was a "medical issue, rather than a gynecological" problem (*id.*), and thus entirely within the scope of the defendant's duty as the primary medical physician.

This was error. The court's holding that an issue of fact exists as to the thoroughness of the defendant's examination of August 4, 2005 is based on an assumption that the abdominal mass was present and discernible at the time of the first visit in August 2005. This is an assumption of facts not in the evidence of record: At deposition, the plaintiff simply could not recall when and to whom she complained about the abdominal mass first—or even whether she showed it to the defendant. She testified that she showed the mass to "my doctor" identifying the doctor as Dr. Brown. She was asked: "Was Dr. Brown the first [to see the abdominal mass]?" The plaintiff answered: "I'm not sure." As to the defendant, the plaintiff was asked: "Did you show [Dr. Beautyman the] lipoma?" Upon replying, yes, she was asked, "When?" The plaintiff replied, "I don't know."

It is disingenuous of the plaintiff to assert, on appeal, that "[s]ince the January 11, 2006 examination was focused on the ankle, plaintiff must have showed the mass to Dr. Beautyman on August 4, 2005." Indeed, this is nothing more than impermissible speculation which is clearly controverted by the deposition testimony of the defendant and the West Care group of doctors, as well as by the evidence of record which shows that the first reference to any abdominal mass appeared in the plaintiff's medical charts on September 20, 2005.

Dr. Brown testified there was no evidence of an abdominal mass during the plaintiff's visits on June 30, July 28 or even August 25. The defendant similarly testified that there was no evidence of any discernible masses at the visit on August 4th; and that the plaintiff did not come to her with a complaint, but solely for a general physical examination. There is no notation of any mass in the plaintiff's medical chart from that visit, nor any notation that the plaintiff complained about it. Neither are there any notations of an abdominal mass in the plaintiff's medi-

cal charts at West Care at this time. This establishes that the plaintiff neither complained nor presented with any discernible abdominal mass on her documented visits at West Care on June 30, or July 28, 2005 (approximately a week before her visit with the defendant), or even on August 25 (three weeks after the visit with the defendant) during an examination at West Care. Moreover, there is no expert affidavit in the record stating that an abdominal mass of the size noted on October 12 during the sonogram would have been discernible or palpable two months earlier at the plaintiff's first office visit with the defendant.

 The motion court also erred in finding an issue of fact as to the thoroughness of the defendant's examination of the plaintiff at the second office visit in January 2006. The court observed that the defendant as the primary care physician had a duty to examine plaintiff's abdomen at that visit, or "at the very least" to discuss the sonogram report and suggest a follow-up biopsy (*id.*). The court, thus, imposed on the defendant the duty of overseeing a course of treatment commenced by another treating physician who specifically referred the plaintiff to a different specialist to follow up on her condition. Moreover the court did so without reference to any legal authority and erroneously relied instead on the opinion of the plaintiff's expert.

We have repeatedly held that in order to reach any discussion about deviation from accepted medical practice, it is necessary first to establish the existence of a duty. (*See e.g. Cregan v Sachs*, 65 AD3d 101 [1st Dept 2009].) Whether a defendant doctor owes a plaintiff a duty of care is a question for the court. (*McNulty v City of New York*, 100 NY2d 227, 232 [2003].) It is generally not an appropriate subject for expert opinion. (*Dallas-Stephenson v Waisman*, 39 AD3d 303 [1st Dept 2007].)

 In this case, the defendant asserts that the dispositive factor in ascertaining duty is not the defendant's primary care physician status, but the extent to which the defendant advised, and the plaintiff relied on advice about the abdominal mass. Well-established precedent supports this view. (*See Maggio v Werner*, 213 AD2d 883, 884 [3d Dept 1995], citing *Markley v Albany Med. Ctr. Hosp.*, 163 AD2d 639, 640 [3d Dept 1990]; *see also Wasserman v Staten Is. Radiological Assoc.*, 2 AD3d 713, 714 [2d Dept 2003]; *Chulla v DiStefano*, 242 AD2d 657 [2d Dept 1997], *lv dismissed* 91 NY2d 921 [1998].)

The foregoing decisions stand for the proposition that, "[a]lthough physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken

by the physician and relied upon by the patient." (*Markley*, 163 AD2d at 640.) In other words, the question is whether the physician owes a duty under the circumstances of a particular scenario. (*See Cregan*, 65 AD3d at 110, citing *Huffman v Linkow Inst. for Advanced Implantology, Reconstructive & Aesthetic Maxillo-Facial Surgery*, 35 AD3d 214 [1st Dept 2006].)

Hence, in *Huffman*, we concluded that plaintiff's primary dentist owed no duty to plaintiff with respect to reconstructive surgery performed by an oral surgeon because the dentist "neither participated in nor was responsible for the surgical aspects of plaintiff's treatment." (35 AD3d at 215.) Similarly in *Wasserman*, the court found that defendants internist and general surgeons could not be charged with the duty to diagnose a nerve disorder in the plaintiff's ankle since "they were not involved in th[at] aspect of [plaintiff's] care." (*Wasserman*, 2 AD3d at 714.)

It is interesting to note that the plaintiff cites to *Maggio* in support of her argument that the defendant had an all-encompassing duty to investigate the abdominal mass, discuss it with the plaintiff and make referrals for follow-up evaluation and treatment. In fact, *Maggio* underscores the principle that a physician's duty is circumscribed by the medical functions undertaken by that physician. (213 AD2d at 884.) In that case, an obstetrician referred a patient under his care during pregnancy to a surgeon for evaluation of a breast lump. The surgeon wrote to the defendant that he did not see a need for direct intervention until after the pregnancy unless there was an obvious change. The patient continued to complain of pain to the defendant obstetrician who continued to advise her that she should not be concerned because "these things are common in pregnancies." (*Maggio* at 884.) Subsequently, the patient was diagnosed with a carcinoma in her right breast.

The court observed that defendant had "assumed a legal duty to provide appropriate care to plaintiff when he accepted her as a patient." (*Maggio*, 213 AD2d at 884.) However, the court added: "The question here is whether that duty extended to the mass found in plaintiff's breast." (*Id.*) In that case, the court *denied defendant summary judgment because it found an issue of fact as to* "whether defendant undertook to advise plaintiff about her condition . . . which advice was accepted and relied upon by plaintiff." (*Id.*)

In this case, no triable issue of fact exists as to whether the defendant played any role in advising the plaintiff on the diagnosis or treatment of her abdominal mass. On the contrary, it is

indisputable, as evidenced by the radiology report in the record, that Dr. Brown of West Care ordered the sonogram, and that she was faxed the results. The report also includes notations by Dr. Brown that she discussed the results with the plaintiff. At deposition, Dr. Brown testified that she formed a differential diagnosis and set the course of treatment.

Dr. Brown ordered the sonogram because that is what "we routinely do." Indeed, it is Dr. Brown who had sent the plaintiff for tissue sample upon finding a soft tissue mass on her left underarm in 1999. Moreover, while all the physicians who were deposed, including the defendant, agreed that only a biopsy could determine conclusively whether the mass was indeed benign, Dr. Brown further testified that because the radiology report did not raise concerns, it was decided not to do anything further until after the birth of the plaintiff's child. The plaintiff agreed with that characterization of a "wait and watch" course of treatment. Dr. Brown further testified that she had advised the plaintiff to see a breast surgeon.

Finally Dr. Brown acknowledged that the abdominal mass was monitored during the plaintiff's prenatal visits at West Care. She testified that if there was no notation about the mass in the plaintiff's charts it meant there was no significant change in size and no complaints by the plaintiff. Dr. Brown testified that a biopsy would have been recommended if there had been a significant change in size or if the plaintiff had complained about pain.

Nor did the plaintiff raise the subject of the abdominal mass with the defendant on the date of her second office visit on January 11, 2006. It was a problem-specific visit following the plaintiff's fall at a construction site. This is further evidenced by the plaintiff's testimony that she was disgruntled that she had to come into the office when all she had wanted was a referral for physical therapy over the telephone.

Consequently, notwithstanding the fact that Dr. Brown faxed a copy of the radiology results to the defendant, it is indisputable that the defendant was not involved in the setting or monitoring of the course of treatment prescribed for the plaintiff's abdominal mass. Neither Dr. Brown nor any other physician at West Care spoke to the defendant about the report. Moreover, when Dr. Brown faxed the report to the defendant, it appears from the record to have been faxed with Dr. Brown's notation in the bottom left corner that she had called the plaintiff on October 12.

Finally, the plaintiff's reliance on *Daugharty v Marshall* (60 AD3d 1219 [3d Dept 2009]) is misplaced. In that case, a triable issue of fact was raised when a family practitioner failed to refer the decedent to a specialist even though the decedent was also receiving care from a cardiologist. However, unlike the primary care physician in this case who saw the plaintiff only twice, in *Daugharty*, the family practitioner had been treating decedent for 13 years and for a number of various ailments including hypertension, coronary artery disease, compulsive obstructive pulmonary disease, arthritis, gallstones and prostate complaints. The court concluded that because the decedent made ongoing complaints to the family practitioner about abdominal pain, it was the practitioner's duty to make the referral to a gastroenterologist.

The plaintiff, therefore, produces no legal authority for the view that a primary care physician has an independent duty to assess the course of treatment set and monitored by another physician. We decline to adopt such a view in these circumstances.

Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered November 22, 2010, which, insofar as appealed from, denied defendant-appellant's motion for summary judgment dismissing the complaint as against her, should be reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment accordingly.

TOM, J.P. (dissenting). The alleged malpractice at issue on this appeal is the failure to refer plaintiff for a biopsy to determine if two abdominal masses discovered during an ultrasound examination were malignant. The summary judgment motion of those defendants providing obstetrical care was granted in the absence of opposition and the complaint dismissed as against them, leaving only the question of whether Supreme Court erred in denying the companion motion of appellant Elizabeth J. Beautyman.[1] It is asserted that Beautyman owed no duty to her patient because, while fully aware of the masses, she took no action to treat them.

As plaintiff's primary care physician, Beautyman cannot abdicate responsibility for her patient's health care. Beautyman concedes that in October 2005 she received, reviewed and

---

1. The motion of the plastic surgeon who removed the masses was also denied, but no appeal has been taken.

incorporated into plaintiff's medical record a copy of the report of Dr. Sherman Lipshitz, a radiologist, who interpreted the ultrasound examination. However, Beautyman failed to follow up by referring plaintiff for appropriate diagnosis and treatment, thereby contributing to injuries resulting from the delay in excising a liposarcoma.

The American Academy of Family Physicians defines "primary care physician" as "a generalist physician who provides definitive care to the undifferentiated patient at the point of first contact and takes continuing responsibility for providing the patient's care" (AAFP Policies, *Primary Care*, available at http://www.aafp.org/online/en/home/policy/policies/p/primarycare.html [definition #3]). The definition continues, inter alia: "The style of primary care practice is such that the personal primary care physician serves as the entry point for substantially all of the patient's medical and health care needs—not limited by problem origin, organ system, or diagnosis" (*id.*).

Whether or not the abdominal masses were apparent at the time Beautyman first examined plaintiff in August 2005, Beautyman certainly knew of their existence by the time plaintiff again consulted her in January 2006. The radiologist's report describes two discrete palpable masses, one in the left anterior upper abdominal wall, and the other in the left axilla. Beautyman, as plaintiff's primary care physician, assumed the responsibility to see that her patient's medical needs were met. Indeed, the affidavit of plaintiff's expert internist states that Beautyman's failure to reexamine her patient and make a referral for a biopsy deviated from accepted medical practice.

The failure to alert plaintiff to the need to rule out the possibility of a malignancy is particularly egregious under the circumstances because Beautyman's inaction implied that no further treatment was necessary. This Court has noted that even in the absence of a physician-patient relationship, the failure to disclose a potentially injurious medical condition may constitute ordinary negligence where the person examined is likely to construe silence to mean that he or she is in good health (*see McKinney v Bellevue Hosp.*, 183 AD2d 563, 565 [1992] [differential diagnosis of pyoinflammatory disease or lung neoplasm following pre-employment chest X ray]). As we stated, "The tendency of the average person, in similar circumstances, to interpret . . . silence as an indication of good health is so apparent and the consequence of such reliance so potentially serious that we conclude that the law imposes a duty to disclose"

(*id.* at 566). Because the burden of disclosure is slight, the seriousness of the harm to be avoided warrants departure from the general rule that absent a relationship giving rise to such obligation, no duty to disclose is imposed by law (*see Stambovsky v Ackley*, 169 AD2d 254 [1991]).

As a bare minimum, the existence of a physician-patient relationship imposes a duty to alert the patient to a potential threat to her health, otherwise unknown to her (*see Caracci v State of New York*, 203 AD2d 842, 845 [1994] [cause of action for ordinary negligence sustained where health center failed to apprise student of a radiologist's report indicating an abnormal mass]). Particularly where, as here, a physician has undertaken to provide primary medical care, there is a duty to advise the patient of those conditions known to the physician that pose a threat to the patient's health so that the patient may make an informed decision whether to seek further treatment (*see McKinney*, 183 AD2d at 565-566). Furthermore, as the physician primarily responsible for the patient's care, Beautyman was subject to the additional duty to take such appropriate medical action as might be necessary to diagnose and treat the condition, either personally or by way of referral to a qualified practitioner (*see Daugharty v Marshall*, 60 AD3d 1219 [2009] [primary care physician liable for failure to (1) diagnose gastrointestinal conditions and (2) refer the patient to a gastroenterologist]).

The cases relied upon by Beautyman in support of dismissal of the complaint are distinguishable in that the patients were known to be undergoing treatment for the injurious condition (*Wasserman v Staten Is. Radiological Assoc.*, 2 AD3d 713 [2003] [radiological group not involved in plaintiff's orthopedic treatment not liable for failure to diagnose nerve condition in her ankle]; *Chulla v DiStefano*, 242 AD2d 657 [1997], *lv dismissed* 91 NY2d 921 [1998] [clinic that implanted birth-control device not liable for failure to diagnose breast cancer in a patient being treated by another medical group]; *Lipton v Kaye*, 214 AD2d 319 [1995] [as a matter of policy, non-treating consultant pathologist under no duty to follow up with treating obstetrician]; *Markley v Albany Med. Ctr. Hosp.*, 163 AD2d 639 [1990] [pediatricians, to whom infant undergoing chemotherapy was referred for general care, not liable for overdose of drug administered during the course of infant's chemotherapy]; *cf. Maggio v Werner*, 213 AD2d 883 [1995] [question of fact as to whether patient continued to rely on advice given by her obste-

trician after she was referred to a surgeon for treatment of breast tumor]). While the general duty of care owed by physicians to their patients "may be limited to those medical functions undertaken by the physician and relied upon by the patient" (*Markley*, 163 AD2d at 640), actually providing primary care induces the patient to rely on the physician to take action where medically appropriate. Where, as here, a primary care physician neither takes suitable action nor even discusses the condition, the patient will naturally be induced to refrain from seeking treatment, to her obvious detriment (*see McKinney*, 183 AD2d at 566; *Caracci*, 203 AD2d at 844). As this Court noted in *Lipton*, liability is predicated on the effect of a misrepresentation or failure to disclose, which induces " 'the person to whom it was made to forego action that might otherwise have been taken for the protection of the plaintiff' " (214 AD2d at 321, quoting *Eiseman v State of New York*, 70 NY2d 175, 187 [1987]).

The majority, seeking to distinguish the Third Department's ruling in *Daugharty*, takes the position that the defendant doctor's duty to refer his patient to a qualified specialist arose only after the passage of many years and over the course of extensive treatment (which did not include the gastric condition at issue). Several points bear emphasis. First, as a simple question of law, the issue is whether the primary care physician's relationship to the patient gives rise to a duty or not. Either the primary care physician owes a duty to refer the patient to the appropriate specialist or no such duty is imposed by law. From the opposite perspective, either a patient is justified in relying on a primary care physician to provide treatment, advice and, where necessary, referral for treatment of general health-related conditions or, as Beautyman argues, the patient is limited to relying on advice and treatment for only those conditions he or she personally brings to the attention of the practitioner.

Second, the negligence involved in this case is the failure to disclose, or even recognize, the potential threat represented by two "palpable" abdominal masses. While it might be acceptable for a specialist rendering limited and particularized treatment to neglect ruling out a hazardous medical condition outside his area of specialization,[2] no such latitude extends to a physician who assumes responsibility for the general health of the patient.

---

2. Since no appeal has been taken from the dismissal of the complaint as against the physicians who provided obstetrical care and expressed "no concern" about the masses, this issue is not before us.

As noted, the expectation that the primary care physician will assume such responsibility arises at the outset from the nature of the physician-patient relationship, not from any long-standing association between doctor and patient.

Third, the majority concludes that Beautyman had no duty to assess the course of treatment provided by other physicians; however, no such treatment was in fact provided. Plaintiff stated that the obstetrical group had decided on a "wait and watch" approach, with the result that they provided no treatment at all. In reality, Beautyman does not allege that she relied on diagnostic actions taken by other physicians but on their very inaction. Had Beautyman taken the minimal step of discussing the radiologist's report with her patient, it would have been readily apparent that absolutely nothing was being done to determine whether the abdominal masses were malignant. Notably, Beautyman provides no basis for relying on doctors who were providing obstetrical care to render appropriate and necessary services to her patient that would normally be provided by an oncologist or pathologist.

Finally, the duty breached is, in the first instance, that of disclosure—specifically that the two masses (of which both patient and doctor were aware) could not simply be assumed to be benign—and, more broadly, the failure to refer the patient for a biopsy to obtain a definitive diagnosis. As Beautyman conceded in her deposition testimony, physical examination of a mass only offers "clues" as to its malignancy and that "[t]he only way to know for sure would be either a biopsy or an excision and biopsy." Her omission to make a referral for this procedure was particularly harmful under the circumstances because the patient, faced with a number of doctors who expressed no concern about her condition, relied to her detriment on there being nothing about which she needed to be concerned (see Bradley v St. Charles Hosp., 140 AD2d 403, 404 [1988] [hospital can be held liable for failure to diagnose malignant condition where employee was induced to rely upon the results of an annual physical examination]; cf. Lee v City of New York, 162 AD2d 34, 38-39 [1990], lv denied 78 NY2d 863 [1991]). Significantly, there is no indication in the record why immediate referral for a needle biopsy would have been contraindicated by the course of plaintiff's pregnancy, or for any other reason. Thus, the failure to refer plaintiff to a qualified specialist "in and of itself, represented a deviation from the applicable standard of care" (Daugharty, 60 AD3d at 1221).

In sum, this is a case where no treating physician exercised due care to determine, by appropriate medical testing, whether a patient's medical health was threatened by a malignancy. The gravamen of Beautyman's defense is that she was entitled to rely on the judgment of other treating physicians who saw no need for concern. It should be evident, however, that one doctor's negligence may not be excused by the inadequate treatment provided by another (*see Datiz v Shoob*, 71 NY2d 867 [1988]; *Ruddy v Nolan*, 37 AD3d 694, 695 [2007]). Thus, it is immaterial that other doctors, who received the same radiologist's report as Beautyman, likewise neglected to take the obvious next step of ordering a needle biopsy. Since there is record evidence that such omission constitutes a departure from the applicable standard of care, there remains a material question of fact precluding summary judgment in favor of Beautyman.

Further, plaintiff's initial visit with Beautyman was on August 4, 2005, for a full physical checkup. At that visit Beautyman had plaintiff disrobe to conduct the examination. Beautyman's chart for plaintiff's examination on that day showed no masses present. However, plaintiff had a left underarm benign mass that had been observed by other doctors, and documented as early as 1999, raising questions about the examination. Moreover, plaintiff testified that, in the same month she first saw Beautyman, she noticed the abdominal mass to be the size of an egg.

Accordingly, the order should be affirmed.

SAXE, MOSKOWITZ, MANZANET-DANIELS, JJ., concur with CATTERSON, J.; TOM, J.P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered November 22, 2010, reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment accordingly.