Rosario v Our Lady of Consolation Nursing & Rehabilitation Care Ctr. (2020 NY Slip Op 04983)





Rosario v Our Lady of Consolation Nursing & Rehabilitation Care Ctr.


2020 NY Slip Op 04983


Decided on September 16, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 16, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

REINALDO E. RIVERA, J.P.
LEONARD B. AUSTIN
JOHN M. LEVENTHAL
ANGELA G. IANNACCI, JJ.


2017-02919
 (Index No. 18180/11)

[*1]Roxanne Rosario, etc., respondent, 
v
Our Lady of Consolation Nursing and Rehabilitation Care Center, et al., defendants, Imtiaz A. Khokhar, etc., appellant.


Law Offices of Benvenuto & Slattery (Rubin Sheeley Paterniti Gonzalez Kaufman LLP, New York, NY [James W. Tuffin], of counsel), for appellant.
Isaacson, Schiowitz & Korson, LLP, Rockville Centre, NY (Martin Schiowitz of counsel), for respondent.



DECISION & ORDER
In an action to recover damages for medical malpractice, the defendant Imtiaz A. Khokhar appeals from an order of the Supreme Court, Suffolk County (Denise F. Molia, J.), dated January 17, 2017. The order, insofar as appealed from, denied that defendant's motion for summary judgment dismissing the complaint insofar as asserted against him.
ORDERED that the order is affirmed insofar as appealed from, with costs.
On April 30, 2009, after suffering a fall at home, 70-year-old Martha Rosario (hereinafter the decedent) was admitted to Good Samaritan Hospital by her primary care physician, the defendant Imtiaz A. Khokhar, who had been her primary care physician for eight years. On May 11, 2009, the decedent was transferred to the defendant Our Lady of Consolation Nursing and Rehabilitation Care Center (hereinafter OLOC) for strengthening and physical rehabilitation. During her admission to OLOC the decedent's condition deteriorated. The decedent began to exhibit increased fatigue, developed pressure ulcers and fever, experienced urinary and bowel incontinence and loss of appetite, and had periods of forgetfulness and confusion. She was discharged to Good Samaritan Hospital on May 30, 2009. There she was diagnosed with stage II pressure ulcers on her sacrum, an unstageable pressure ulcer on her buttocks, a left heel ulcer, a urinary tract infection with sepsis, hypotension, and pneumonia. On June 6, 2009, the decedent died at Good Samaritan Hospital. Her death certificate lists the immediate cause of death as cardiopulmonary arrest due to coronary artery disease and hypertension, with urosepsis as a significant contributing factor.
On June 2, 2011, the decedent's daughter Roxanne Rosario (hereinafter the plaintiff), as the administrator of the decedent's estate, commenced the instant medical malpractice action against, among others, OLOC and the Roman Catholic Diocese of Rockville Centre, Inc. (hereinafter together the OLOC defendants), and Khokhar, alleging that the decedent was injured as a result of medical malpractice committed during her admission to OLOC. At the completion of discovery, the OLOC defendants and Khokhar separately moved for summary judgment dismissing the complaint insofar as asserted against each of them. By order dated January 17, 2017, the Supreme Court denied the motions. Khokhar appeals from so much of the order as denied his motion.
" The essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury'" (Hayden v Gordon, 91 AD3d 819, 820, quoting DiMitri v Monsouri, 302 AD2d 420, 421). "A defendant moving for summary judgment in a medical malpractice case must demonstrate the absence of any material issues of fact with respect to at least one of these elements" (DiLorenzo v Zaso, 148 AD3d 1111, 1112 [internal quotation marks omitted]; see Hayden v Gordon, 91 AD3d at 820-821; Wexelbaum v Jean, 80 AD3d 756, 757). Where a defendant makes a prima facie showing on both elements, "the burden shifts to the plaintiff to rebut the defendant's showing by raising a triable issue of fact as to both the departure element and the causation element" (Stukas v Streiter, 83 AD3d 18, 25). "Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions" (Feinberg v Feit, 23 AD3d 517, 519). On a motion for summary judgment, the party opposing the motion is entitled to every favorable inference that may be drawn from the pleadings and affidavits submitted by the parties (see Nicklas v Tedlen Realty Corp., 305 AD2d 385).
Here, Khokhar established his prima facie entitlement to judgment as a matter of law by submitting an expert affirmation from a physician who opined, based on a review of the medical records, that the care and treatment rendered by Khokhar comported with good and accepted medical practices and was not proximately related to any injuries sustained by the decedent (see Forrest v Tierney, 91 AD3d 707; Graziano v Cooling, 79 AD3d 803, 804).
In opposition, the plaintiff submitted an affirmation from an expert which raised a triable issue of fact as to the nature of the physician/patient relationship between Khokhar and the decedent while she was at OLOC, specifically, whether Khokhar was still a treating physician of the decedent while she was at OLOC, since while she was there he performed a physical exam of her and did an assessment and plan which included orders for x-rays and a complete blood count (see Omane v Sambaziotis, 150 AD3d 1126, 1129; Elmes v Yelon, 140 AD3d 1009, 1011; Nisanov v Khulpateea, 137 AD3d 1091, 1094). Further, and contrary to the assertion of our dissenting colleague, the affirmation of the plaintiff's expert, reasonably construed in a light most favorable to the plaintiff, was not speculative or conclusory, but rather sufficiently raised triable issues of fact as to whether Khokhar departed from accepted medical practice and whether his alleged departures were a proximate cause contributing to the decedent's death (see Joyner v Middletown Med., P.C., 183 AD3d 593; M.C. v Huntington Hosp., 175 AD3d 578). Our dissenting colleague appears to require the use of specific words by a party opposing a motion for summary judgment as opposed to the proper standard of viewing the totality of the submissions in a light most favorable to the non-moving party (see Pierre-Louis v DeLonghi Am., Inc., 66 AD3d 859, 862; Nicklas v Tedlen Realty Corp., 305 AD2d at 386). In any event, the words "reasonable" and "fair," in the context of the affirmation of the plaintiff's expert, are synonymous.
Accordingly, we agree with the Supreme Court's denial of Khokhar's motion for summary judgment dismissing the complaint insofar as asserted against him.
RIVERA, J.P., LEVENTHAL and IANNACCI, JJ., concur.
AUSTIN, J., dissents, and votes to reverse the order insofar as appealed from, on the law, and grant the motion of the defendant Imtiaz A. Khokhar for summary judgment dismissing the complaint insofar as asserted against him, with the following memorandum:
The majority's recitation of the facts in this case would lead the reader to believe that the defendant Imtiaz A. Khokhar was intimately involved in the ongoing treatment and care of the plaintiff's decedent, Martha Rosario (hereinafter the decedent), from the decedent's initial hospitalization at nonparty Good Samaritan Hospital (hereinafter the hospital) on April 30, 2009, until her death there on June 9, 2009. That is simply not the case.
Properly analyzed, the decedent's care over this period can best be understood in three distinct stages. In the first stage, the decedent was admitted to the hospital for observation as a result of a fall at home wherein she sustained neck trauma. At that time, Khokhar was the decedent's [*2]primary care physician, as noted on the hospital's admission paperwork. The decedent was treated at the hospital under Khokhar's care until May 11, 2009, when she was discharged.
The decedent's discharge summary, which was prepared by Khokhar, noted that during her hospitalization the decedent "developed swelling of her left lower extremity along with redness." As a result of an evaluation on May 5, 2009, by another doctor, Lenny Weinstein,[FN1] the decedent was treated with Clindamycin and Bacid, intravenously and then orally. A wound care nurse attended to the decedent and applied a dressing. Such treatment was continued for the remainder of the decedent's stay at the hospital.
On May 11, 2009, upon the decedent being discharged from the hospital and Khokhar's care, she was admitted to a subacute rehabilitation facility, the defendant Our Lady of Consolation Nursing and Rehabilitation Care Center (hereinafter OLOC), for gait and strength training. The decedent's treatment plan anticipated that, after her stay at OLOC, the decedent could return home. This began the second stage of the decedent's care.
On her admission to OLOC, the decedent's primary care physician was Alice Kolasa. Throughout the decedent's admission to OLOC, Kolasa remained her primary care physician, even though other physicians examined and treated the decedent during her stay.
The condition of the decedent's skin was noted on OLOC's admission assessment and care screening form. Section M, entitled "Skin Condition," did not specifically indicate that the decedent had any ulcers. However, this section stated that, in the seven days prior to the decedent's admission to OLOC, she had utilized pressure relieving devices for the chair and bed, and had received "ulcer care," "other preventive or protective skin care," "preventive or protective foot care," and had dressings applied to her feet. Section S, entitled "State Supplement," noted that there were no stage III or IV pressure ulcers "currently reported," although a stage II ulcer was noted upon her admission to OLOC. The progress notes regularly reflected observation of, and treatment for, pressure ulcers which developed.
During her 19-day stay at OLOC, the decedent was only seen once by Khokhar, while he was serving as a covering, per diem physician. The decedent's family asked Khokhar to see the decedent solely with respect to her complaints pertaining to her neck and ribs. When Khokhar saw the decedent for these complaints, he ordered cervical spine and rib x-rays and a complete blood count (hereinafter CBC), which all had negative results.
Later in her admission to OLOC, and after she had been seen by Khokhar, the decedent's condition deteriorated, beginning the third and final stage of the decedent's care. On May 30, 2009, the decedent began to exhibit increased fatigue, periods of forgetfulness and confusion, and fever. She was then discharged to the hospital for observation. At the hospital, she was diagnosed with a urinary tract infection with sepsis, hypotension, pneumonia, a left heel ulcer, a stage II pressure ulcer on the sacrum, and an unstageable pressure ulcer on her buttocks.
On June 6, 2009, the decedent died at the hospital. Her death certificate listed the cause of death as cardiopulmonary arrest as a consequence of coronary artery disease and hypertension, with urosepsis as a contributing factor.
On June 2, 2011, the decedent's daughter Roxanne Rosario (hereinafter the plaintiff), as the administrator of the decedent's estate, commenced this medical malpractice action against, among others, OLOC and the Roman Catholic Diocese of Rockville Centre, Inc. (hereinafter together the OLOC defendants), and Khokhar, alleging that the decedent was injured and ultimately [*3]died as a result of medical malpractice committed during her admission to OLOC. At the completion of discovery, the OLOC defendants and Khokhar separately moved for summary judgment dismissing the complaint insofar as asserted against each of them. The Supreme Court denied both motions. Khokhar appeals from so much of the order as denied his motion.
"[T]o establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (Stukas v Streiter, 83 AD3d 18, 23; see Korszun v Winthrop Univ. Hosp., 172 AD3d 1343, 1344; Hutchinson v New York City Health & Hosps. Corp., 172 AD3d 1037, 1039). "In moving for summary judgment dismissing a complaint alleging medical malpractice, a defendant [physician] must establish, prima facie, either there was no departure or that any departure was not a proximate cause of the plaintiff's injuries" (Lesniak v Stockholm Obstetrics & Gynecological Servs. P.C., 132 AD3d 959, 960; see Korszun v Winthrop Univ. Hosp., 172 AD3d at 1344-1345). Once a defendant has made such a showing, the burden shifts to the plaintiff to "submit evidentiary facts or materials to rebut the prima facie showing by the defendant physician" (Alvarez v Prospect Hosp., 68 NY2d 320, 324; see Stukas v Streiter, 83 AD3d at 24).
In restating the fundamental principles of analyzing the burdens of proof on a motion for summary judgment in a medical malpractice action, I highlight the differences between my colleagues in the majority's view of the evidence presented by the parties—including expert opinions—and mine. In my view, the record demonstrates that the plaintiff failed to establish a triable issue of fact as to the proximate cause between the alleged departures of Khokhar from good and accepted medical practice and the decedent's death.
I agree with my colleagues in the majority that Khokhar established his prima facie entitlement to judgment as a matter of law dismissing the complaint insofar as asserted against him by submitting the affirmation of his expert, Randolph P. DiLorenzo, who reviewed all of the records and submissions submitted by the parties on this summary judgment motion. This included the plaintiff's bill of particulars and supplemental bill of particulars. DiLorenzo noted that the medical records and the deposition testimony demonstrated, to a reasonable degree of medical certainty, that none of the departures from good and accepted medical practice alleged in the bill of particulars and supplemental bill of particulars were committed by Khokhar.
Indeed, my colleagues in the majority appear to concur with a substantial portion of DiLorenzo's opinion. They acknowledge that Khokhar, who was the decedent's treating physician during her admission at the hospital, ceased to function in that role upon her transfer to OLOC on May 11, 2009.
The record demonstrates, and my colleagues in the majority agree, that it was not until after the decedent was admitted to OLOC that her condition started to deteriorate. It was then that she began to exhibit fatigue, developed pressure ulcers and fever, had bowel incontinence, had a loss of appetite, and had periods of forgetfulness and confusion. It must be remembered that, at that point in time, the decedent was under the direct and sole care of Kolasa and Kolasa's primary care team; not Khokhar. Even a cursory review of the medical charts from the decedent's admission at OLOC reflects that all treatment was under the direction and control of Kolasa and her health care team of doctors, nurses, and registered dieticians.
Stated differently, Khokhar was not involved in any way in the decedent's care or treatment from the date of her discharge from the hospital until May 27, 2009, 16 days later, when he saw her for the first and only time at OLOC. At that time, Khokhar saw the decedent in the capacity of a covering, per diem physician. He was not her treating or attending physician [FN2]. He saw [*4]the decedent because of her complaints of neck and rib pain. He conducted a focused examination relating only to those complaints, ordered x-rays of the cervical portion of her spine and her ribs, which were negative, and ordered a CBC, which showed a normal white blood cell count; to wit: no infection.
The decedent was otherwise asymptomatic when seen by Khokhar for those specific complaints. Since the OLOC medical records reflected that the decedent's throat infection and nutrition and hydration already were being addressed by Kolasa as the attending physician, Khokhar appropriately deferred to Kolasa and her team with respect to those issues.
The decedent exhibited none of the symptoms that she manifested three days later, on May 30, 2009, which resulted in her transfer back to the hospital. When she was examined by Khokhar, the decedent had no fever, no signs of a urinary tract infection or urosepsis, and no signs of altered mental status, since he found her to be "oriented x 3."
Likewise, with regard to the pressure ulcers which the plaintiff claims Khokhar ignored and the plaintiff's expert suggested in conclusory fashion enabled methicillin-resistant staphylococcus aureus (hereinafter MRSA) to enter the decedent's system, the OLOC medical records show that Khokhar did not ignore them. The OLOC medical records reflect that when the decedent was admitted to OLOC on May 11, 2009, she was already receiving the antibiotics Clindamycin and Bacid for treatment of what had been diagnosed at the hospital as cellulitis. When Khokhar saw the decedent on May 27, 2009, pressure ulcers had already been noted by Kolasa, who previously ordered various topical medications to address them. Indeed, a nurse's note in the decedent's OLOC chart, dated May 22, 2009, prior to Khokhar seeing the decedent, stated:
"Bruised area noted. Left heel 3x3. Possible [deep tissue injury]. Patient's daughter aware. MD aware. [New order] [dry padded dressing] to left heel daily. Heel boot while in bed, open heel pressure relief shoe while [out of bed]. Fungal rash to sacral area. Baza antifungal was ordered. Will monitor."
In apparent response to this note, Kolasa also ordered Solosite gel and dry padded dressing for the decedent's buttocks. This treatment protocol was also previously ordered for the pressure sore between the decedent's toes.
In his thorough analysis of all of the plaintiff's allegations of departures by Khokhar, DiLorenzo concluded by stating:
"It is my opinion within a reasonable degree of medical certainty that the claims contained in the pleadings, the plaintiff's Bill of Particulars and Supplemental Bill of Particulars are not supported by the medical record of [OLOC] or the testimony of the parties. It is my opinion within a reasonable degree of medical certainty that [Khokhar's] treatment of the decedent on May 27, 2009 conformed to good and accepted medical practices and that the treatment was not a substantial factor in causing any injury or the death of the decedent" (emphasis added).
It was on the strength of this opinion, the medical records, and the testimony presented that I agree with my colleagues in the majority that Khokhar met his prima facie burden of proof entitling him to the dismissal of this action insofar as asserted against him.
In opposition to Khokhar's prima facie showing, the plaintiff failed to adequately respond to DiLorenzo's opinion that Khokhar did not deviate from the accepted standard of care. Significantly, the plaintiff utterly failed to address or refute with medical or legal sufficiency, DiLorenzo's opinion establishing the absence of proximate cause arising from Khokhar's alleged [*5]departures.
The affirmation of the plaintiff's expert, Emily Yurberg, reflects that she relied on the same records as DiLorenzo. In addition, she reviewed DiLorenzo's expert affirmation.
Notwithstanding having reviewed DiLorenzo's expert affirmation, Yurberg failed to track or distinguish DiLorenzo's findings. Instead, Yurberg issued a strong indictment of the deficiencies in the care administered by OLOC from the time of the decedent's admission to the time of her discharge to the hospital 19 days later. Yurberg noted that on May 15, 2009, the decedent was seen by a pain specialist who recommended a swallow evaluation, but that OLOC had done nothing to address that recommendation until the decedent's daughters scheduled an appointment on May 22, 2009, with a doctor outside OLOC. That outside doctor diagnosed the decedent as suffering from esophagitis, grade 4, as well as gastritis and esophageal candidiasis. Yurberg asserted that those conditions should have been treated "within 4 days of dysphagia," which is difficulty swallowing. Curiously, Yurberg, in conclusory fashion, stated:
"As a result, I can say to a fair degree of medical certainty that the esophagitis became more severe as a result of the candidiasis, and made swallowing very painful and difficult to treat. The lack of amounts of protein and liquid weakened her, which adversely affected healing of the pressure ulcers on her foot and made her more susceptible to additional pressure ulcers and infections, as will be discussed further below" (emphasis added).
A key takeaway from Yurberg's opinion was that all of the departures from good and accepted medical practice with regard to the decedent's nutrition and hydration occurred, were noted, and were addressed by OLOC approximately one week before Khokhar saw the decedent for the only time after her discharge from the hospital and before her subsequent return to the hospital. Notably, the observation and treatment of the decedent's pressure ulcers began upon the decedent's admission to OLOC.[FN3]
The other key takeaway is that Yurberg, who utilized the standard "reasonable degree of medical certainty" elsewhere in her affirmation in describing the departures of OLOC, eschewed it when discussing the alleged departures of Khokhar and resulting causation, for a "fair degree of medical certainty" standard which connotes a lesser professional surety of her opinion.
As Yurberg continued her review of the decedent's care and treatment at OLOC, she critiqued and criticized the treatment and departures by the OLOC medical staff with regard to the decedent's throat/swallowing and pressure ulcer issues. Specifically, she noted that there was no repositioning of the decedent on May 22, 2009.
Although the plaintiff argues that Khokhar had an obligation to note pressure ulcers found on the decedent, such notations would have, at best, been cumulative to the notes and findings made by Kolasa and her staff prior to May 27, 2009. Yurberg noted that, on May 26, 2009, the decedent saw Maureen Corry, a vascular doctor not affiliated with OLOC, with regard to a preexisting coronary artery disease issue. Corry noted in her report, "[t]he patient also reports that she has had a buttock decubiti as well as a fungal infection on her left lower extremity." Simply put, the plaintiff seeks to hold Khokhar responsible for not observing, noting, and treating that which had been observed, noted, and treated during the previous 16 days by the medical staff at OLOC.
Yurberg took issue with and ascribed departures from good and accepted medical care in the manner in which Khokhar examined, treated, and assessed the decedent. However, Yurberg [*6]did not cite to or rely upon any accepted medical protocols or treatments which the decedent was not already receiving or, more importantly, which Khokhar allegedly failed to do, which proximately resulted in the decedent's injury or death.
Yurberg pointed to the failure of Khokhar to order intravenous fluids for hydration [FN4] and his failure to note two pressure ulcers on the decedent's sacrum, one that was stage II and one which was unstageable. The reason is clear on the record. These pressure ulcers were not noted until the decedent was "transferred back to Good Samaritan Hospital on May 30, 2009," and an admitting exam was conducted. Yurberg also noted that, on May 30, 2009, the decedent had a fever and "was diagnosed with a urinary tract infection with sepsis, hypotension, pneumonia and a stage II pressure ulcer over the sacral and buttocks areas"; not before.[FN5]
From these later diagnoses, Yurberg opined to a reasonable degree of medical certainty with respect to the OLOC defendants, that "the moving defendants' care and treatment of [the decedent] were inconsistent with the standards of good and accepted medical and nursing care and that what the medical and nursing staffs did and did not do caused or exacerbated [the decedent]'s medical condition which eventually led to her death." Yurberg then specifically outlined the basis of her opinion from the record relating to OLOC's treatment of the decedent to support her opinion with a reasonable degree of medical certainty.
In stark contrast, Yurberg stated that, to a "fair degree of medical certainty," it was a deviation from accepted medical and hospital nursing practice to fail to turn and reposition the decedent due to her blanchable skin condition and nutritional deficits noted on the decedent's second day at OLOC. Yurberg continued, "[t]here is no reason why [the decedent] should have developed pressure ulcers on her sacrum and buttocks. This should not have happened and was caused in my opinion due to the negligence and malpractice of the nursing and medical staff." Yurberg gratuitously included Khokhar into this alleged departure, though he was a per diem covering doctor who was an outsider to the OLOC medical team. Yurberg did not even address the treatment Kolasa prescribed for the decedent long before Khokhar visited the decedent on May 27, 2009.
Yurberg then noted that Corry, on May 26, 2009, and Khokhar, on May 27, 2009, saw the early stages of the wounds which "in my opinion later progressed into stage II pressure ulcers" diagnosed at the hospital on May 30, 2009. Then, Yurberg made the unsupported quantum leap of opining with "a fair degree of medical certainty the MRSA entered [the decedent's] body through [the stage II pressure ulcers] and caused her death" (emphasis added). This is the only causation ascribed to Khokhar's treatment of the decedent. The medical and record basis for such conclusion is nowhere to be found in Yurberg's report. It is "speculative and conclusory with respect to the issue of proximate cause, and thus did not raise a triable issue of fact" (Feng Xie v New York City Health & Hosps. Corp., 179 AD3d 895, 897; see Lowe v Japal, 170 AD3d 701, 702; DiLorenzo v Zaso, 148 AD3d 1111, 1114).
In addition, Yurberg found it to be "inexcusable" that Khokhar and the OLOC medical and nursing staff made no notes regarding the pressure ulcers. This contention is simply unsupported, and, in fact, belied by the record. Yurberg herself noted that stage II pressure ulcers were noted and treated by the second day of the decedent's admission to OLOC. Yurberg's opinion is thus rendered conclusory and contrary to the record and, thereby, fails to raise a triable issue of fact (see Feng Xie v New York City Health & Hosps. Corp., 179 AD3d at 897; Lowe v Japal, 170 AD3d at 702; DiLorenzo v Zaso, 148 AD3d at 1114). Moreover, Yurberg plainly understood that [*7]she was applying the less authoritative "fair degree of medical certainty" standard.[FN6]
Yurberg then continued her opinion by inappropriately characterizing Khokhar's treatment of the decedent as "unprofessional behavior" because the decedent had been Khokhar's private patient for eight years prior to the decedent's admission to OLOC. Yurberg cited no professional standards or authorities which would warrant Khokhar being converted from a per diem, covering doctor to one who must interpose himself into the treatment of a patient, albeit one he has previously treated, by usurping the role of the attending physician and her staff who long before May 27, 2009, identified and treated these very conditions. Yurberg also did not specifically identify the medical standard she claimed Khokhar violated.
There is absolutely no basis articulated by Yurberg as to how and why Khokhar's limited role in addressing the decedent's specific complaint imposed upon him the obligation of attending physician for the decedent's total care. Khokhar was at OLOC on May 27, 2009, solely to address the decedent's immediate complaints of neck and rib pain. He did so by ordering x-rays of the cervical portion of the decedent's spine and her ribs and by ordering a CBC, all of which were negative.
The view of my colleagues in the majority that the "nature of the physician/patient relationship" between Khokhar and the decedent raises a triable issue of fact with regard to the duty owed by Khokhar with respect to the treatment he rendered to the decedent on May 27, 2009, wholly misstates the law. "[T]he question of whether a physician owes a duty to the plaintiff is a question for the court, and is not an appropriate subject for expert opinion'" (Burns v Goyal, 145 AD3d 952, 954, mod 30 NY3d 956, quoting Burtman v Brown, 97 AD3d 156, 161). It has nothing to do with any perceived departures from good and accepted medical practice (see Donnelly v Parikh, 150 AD3d 820, 822; Meade v Yland, 140 AD3d 931, 933; Chulla v DiStefano, 242 AD2d 657, 658 ["Although physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied on by the patient"]). The issue my colleagues in the majority would have a jury decide is "whether Khokhar was still a treating physician of the decedent while she was at OLOC." None of the cases cited by my colleagues in the majority either respond to or distinguish Burns, Brutman, Donnelly, Meade, or Chulla, nor do they legitimize a legally non-existent issue of fact.
Nevertheless, even if Khokhar did have such a broad duty, as imposed upon him by my colleagues in the majority—not the law, the fact that the decedent had been diagnosed and treated at the hospital before her discharge and by Kolasa during the 16 days prior to Khokhar's limited, focused examination of the decedent, there has been no proof or claim offered that the decedent's outcome would have been different had Khokhar treated her as Yurberg suggests (see M.C. v Huntington Hosp., 175 AD3d 578, 580; DiLorenzo v Zaso, 148 AD3d at 1113).
To the extent that Yurberg opined in conclusory fashion that "a covering medical physician is supposed to be 100% deputized to act in behalf of the primary care physician," so that when "critical parameters are being addressed" the covering physician should not defer decisions to the attending physician, it is inappropriate conjecture by the expert which cannot be relevant to our analysis. Again, Yurberg misreads the record inasmuch as Khokhar was not asked to address "critical parameters" when he saw the decedent on May 27, 2009. Kolasa and her team identified [*8]and were treating those very medical issues.
Even if such opinions were authoritatively supported and properly before us, they are belied by the record. In an earlier paragraph of her affirmation, Yurberg contradicted the foundation of her opinion when she acknowledged that the stage II pressure ulcers did not progress or manifest themselves until they were diagnosed at the hospital on May 30, 2009. Likewise, as DiLorenzo noted, the medical records of OLOC and the hospital demonstrate clearly that no diagnosis of fever, urinary tract infection with sepsis, or any of the other causes of death were noted until three days after Khokhar's examination and treatment of the decedent began and ended.
At worst, it can be said that Khokhar did not repeat Kolasa's findings of the decedent's condition or the treatment as prescribed by her which were noted in OLOC's medical record prior to Khokhar's focused examination of the decedent.
Significantly, none of Yurberg's findings and opinions as to Khokhar concluded that he had departed from good and accepted medical practice in his treatment of the decedent to a reasonable degree of medical certainty. To support her conclusory opinions as to Khokhar, the best Yurberg could muster was a departure to a "fair degree of medical of certainty."
The strict use of the term of art "reasonable degree of medical certainty" is not mandatory in order to establish that the medical expert has given his or her opinion with reasonable certainty on the evidence presented (see Matott v Ward, 48 NY2d 455, 462-463; Rodriguez v New York City Hous. Auth., 238 AD2d 125, 125, mod 91 NY2d 76). With regard to the alleged malpractice of Khokhar, Yurberg did not convey the requisite certainty of causation as she did with the OLOC defendants. In her expert medical opinion, Yurberg found to a reasonable degree of medical certainty that the decedent's injuries and death were caused by the identified departures of OLOC.
When ascribing fault to Khokhar's alleged departures, Yurberg could only point to a weaker fair degree of medical certainty. Had Yurberg used the "fair" degree standard throughout her affirmation and applied it to both Khokhar and the OLOC defendants, then one could point to Matott and its progeny and say that she used the phrase to connote reasonable certainty of causation as to all of the defendants. Having used both standards, Yurberg's opinion can only be read as finding that the departures ascribed to Khokhar and the harm they allegedly caused lacked the same professional certainty as compared to the departures ascribed to the OLOC defendants. To hold otherwise would turn a blind eye to the clear disparity in Yurberg's use of the different terms and their plain meaning.
This conclusion is supported by the very narrow, focused role played by Khokhar during the decedent's 19-day stay at OLOC [FN7]. The medical records do not support the conclusory, unsubstantiated findings made by Yurberg. That is, the conditions noted by Yurberg, as found in the medical records, predated Khokhar's visit on May 27, 2009, and were being treated by the OLOC staff. The conditions which developed after May 27, 2009, had not yet manifested themselves as of the date of Khokhar's examination of the decedent for neck and rib pain. Moreover, the tests ordered by Khokhar, the CBC and x-rays, were all negative.
On this record, I cannot agree with the view of my colleagues in the majority that the expert opinions of DiLorenzo and Yurberg conflict raising triable issues of fact warranting the denial of summary judgment in favor of Khokhar (see Feinberg v Feit, 23 AD3d 517, 519). In the face of a prima facie showing of entitlement to summary judgment by Khokhar, Yurberg's expert opinion [*9]is "conclusory, speculative, or unsupported by the record" and insufficient to raise triable issues of fact (Wagner v Parker, 172 AD3d 954, 955; see Bowe v Brooklyn United Methodist Church Home, 150 AD3d 1067, 1068), at least with regard to causation.
To avoid being considered speculative and conclusory, opposing expert opinions "should address specific assertions made by movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record'" (Tsitrin v New York Community Hosp., 154 AD3d 994, 996, quoting Roca v Perel, 51 AD3d 757, 759). Summary judgment cannot be defeated if the record contradicts or does not support the expert's opinion (see e.g. Bartolacci-Meir v Sassoon, 149 AD3d 567, 572).
Returning to the standard enunciated in Stukas, the plaintiff must "prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (Stukas v Streiter, 83 AD3d at 23). However, "where a defendant physician makes a prima facie showing that there was no departure from good and accepted medical practice, as well as an independent showing that any departure that may have occurred was not a proximate cause of the plaintiff's injuries, the burden shifts to the plaintiff to rebut the defendant's showing by raising triable issues of fact as to both the departure element and the causation element" (id. at 25). On a motion for summary judgment, it is incumbent on the medical expert for the plaintiff to respond to the findings of the defendant's expert (see id.). Yurberg, in addition to her opinion being contradicted by the record, failed to respond to DiLorenzo's unequivocal opinion that, even if Khokhar departed from good and accepted medical practice, such departure was not a proximate cause of the decedent's injuries or death. Yurberg's failure to address this crucial point of causation renders her opinion insufficient to raise a triable issue of fact as to Khokhar's treatment of the decedent.
The cases cited by the majority support the general principles of law relating to the analysis of summary judgment motions in medical malpractice actions. In Omane v Sambaziotis (150 AD3d 1126), Elmes v Yelon (140 AD3d 1009), and Nisanov v Khulpateea (137 AD3d 1091), this Court found that the plaintiff, in response to the defendant's prima facie showing that there was no departure and/or no causation, was able to establish, through his or her expert, the existence of triable issues of fact as to departures in diagnosis (see Nisanov v Khulpateea, 137 AD3d at 1094) or treatment (see Omane v Sambaziotis, 150 AD3d at 1129; Elmes v Yelon, 140 AD3d at 1011). In such circumstances, unlike here, the denial of those defendants' motions for summary judgment were warranted on the record. Here, the plaintiff has failed to make such a showing as to Khokhar.
Inasmuch as the plaintiff failed to raise a triable issue of fact as to proximate cause, the Supreme Court should have granted Khokhar's motion for summary judgment dismissing the complaint insofar as asserted against him.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: Weinstein found a superficial bullae, a fluid-filled blister, which had no pus, was slightly warm to the touch, and also slightly tender. He prescribed medication and recommended watching the decedent closely.

Footnote 2: As will be discussed infra, although my colleagues in the majority suggest that Khokhar's role as covering or substitute doctor was transmogrified into that of the decedent's attending doctor, no evidence or proof of that role has been submitted by the plaintiff beyond her expert's conclusory opinion for the apparent purpose of foisting a duty of care which is neither relevant nor legally appropriate.

Footnote 3: Yurberg acknowledged that upon the decedent's admission to OLOC on May 11, 2009, it was noted that she had, inter alia, a stage II ulcer between the 4th and 5th toes on her left foot and cellulitis on her lower left extremity, and on May 13, 2009, it was noted that she was a moderate risk for pressure ulcers based on her poor nutrition.

Footnote 4: In fact, at the behest of the plaintiff, Khokhar did order intravenous fluids for the decedent.

Footnote 5: The hospital's admission notes on May 30, 2009, reflect that the decedent's chief complaints, as relayed by her daughter, were that she "developed a fever today while at nursing home," and had a change of mental status earlier that day.

Footnote 6: Yurberg's careful parsing of the "reasonable" and "fair" standards of medical certainty does not appear to be accidental. She clearly knows the difference. They are certainly not responsive to DiLorenzo's consistent findings that Khokhar did not depart from accepted medical practices or that any alleged departures were not the proximate cause of the decedent's injuries or death, to a reasonable degree of medical certainty. Rather, Yurberg appears to use the "fair" standard to cast a large enough net to drag Khokhar into a theory of malpractice which the record does not support. At best, she is stretching to reach a desired conclusion of malpractice by Khokhar by using a lesser standard of certainty.

Footnote 7: Suggesting that Khokhar's examination of the decedent as a result of her complaint of neck and rib pain was "unprofessional behavior" in light of the record here is akin to suggesting that a substitute teacher who covered a class for a day is responsible for a student's failing his or her final examination.